**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
FRANCIS P. MCCONVILLE (*pro hac vice* forthcoming*)*
(fmcconville@labaton.com)
CONNOR C. BOEHME *(pro hac vice* forthcoming*)*
(cboehme@labaton.com)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No. 5:26-cv-2849 |
| Plaintiff, | CLASS ACTION |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| PAYPAL HOLDINGS, INC., JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, and DIEGO SCOTTI, | DEMAND FOR JURY TRIAL |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Norfolk County Retirement System ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to its own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by PayPal Holdings, Inc. ("PayPal" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of PayPal's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a class action brought on behalf of a "Class" of all persons or entities who purchased or otherwise acquired PayPal common stock between February 8, 2024, through February 2, 2026, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      PayPal is a multinational digital payments company which generates most of its revenue from applying fees on transactions made by its merchant and consumer customers.  PayPal's branded checkout offering allows consumers to use their PayPal account when making e-commerce purchases from various merchants.  In recent years branded checkout has been one of PayPal's most important business lines in part because it is the Company's highest-margin offering.

3.      This case is about how PayPal misled investors by claiming it had successfully executed substantial improvements of its branded checkout business, which included a redesign, leading to sustainable growth.  In reality, PayPal was experiencing severe execution issues in the branded checkout business that were undermining growth, yet these issues were concealed for investors during the Class Period.

1

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4.      Investors learned the truth on February 3, 2026, when PayPal disclosed weak branded checkout growth and announced the sudden departure of its chief executive officer ("CEO").  PayPal largely attributed these poor results to "operational and deployment issues" across all regions.

5.      On this news, the price of PayPal stock declined from $52.33 per share on February 2, 2026, to $41.70 per share on February 3, 2026, a decline of over 20 percent.

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant PayPal is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.  The intra-district assignment to the San Jose division of the Court is proper under Local Rule 3-2(e) because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where PayPal is headquartered and the Defendants conduct business.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### THE PARTIES

10.      Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased PayPal common stock during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this complaint.

2

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

11.    PayPal Holdings, Inc. is a California corporation with its principal executive offices located at 2211 North First Street, San Jose, CA 95131.  During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PYPL."

12.    Defendant James Alexander Chriss was, at all relevant times, the President, CEO, and Director of PayPal until his termination on February 3, 2026.

13.    Defendant Jamie S. Miller was, at all relevant times, the Executive Vice President and Chief Financial Officer of PayPal.  Additionally, she has been the Chief Operating Officer of PayPal since February 2025.

14.    Defendant Diego Scotti was, at all relevant times, the Executive Vice President and General Manager of the Consumer Group and of the Global Marketing & Communications Group of PayPal.

15.    Defendant Frank Keller was, at all relevant times, the Executive Vice President and General Manager of Large Enterprise & Merchant Platform Group of PayPal.

16.    Defendants Chriss, Miller, Scotti, and Keller are sometimes referred to herein as the "Individual Defendants."  PayPal together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PayPal's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

18.     PayPal is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to PayPal under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     PayPal is an international company that enables digital payments to simplify commerce experiences.  PayPal generates most of its revenue from applying fees on transactions made by its merchant and consumer customers.

21.     An important statistic for PayPal, closely tracked by analysts and investors, is total payment volume ("TPV"), meaning the total value of the payments completed on PayPal platforms.  TPV is closely connected to PayPal's revenue because greater TPV typically leads to greater transactions fees.

22.     One of PayPal's critical business lines is its branded checkout offering, which allows consumers to make payments on merchant sites using their PayPal credentials.  In recent years branded checkout has been one of PayPal's most important business lines in part because it is the Company's highest-margin offering.

23.     Defendant Chriss took over as CEO of PayPal on September 27, 2023.  From early in his tenure, improving branded checkout to increase its growth was a major priority for PayPal.  At the outset of the Class Period, Defendant Chriss called accelerating branded checkout one of the "most important priorities we're focused on."  He also stated that "we're focused on accelerating growth in branded checkout" and "[b]randed checkout is a critical part of PayPal's value proposition."  As part of these efforts, Defendant Chriss explained the Company had "redesigned our branded checkout experience."

### Materially False and Misleading Statements Issued During the Class Period

24.     The Class Period begins on February 8, 2024, the first trading day after Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2024.  During the

4

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

corresponding earnings call, Defendants made the following statement regarding branded checkout and the Company's business outlook:[1]

> *To start, we redesigned our branded checkout experience, creating more simplicity and consistency with the goal of optimizing presentment, increasing speed and minimizing friction across all major checkout flows. When combined with our efforts in password less authentication, these new flows can result in up to an additional 50% drop in latency, allowing a shopper to checkout twice as fast. Improvements like this are aimed at driving a higher selection rate of PayPal and better conversion for our merchants.*

25.     On March 4, 2024, during the Morgan Stanley Technology, Media & Telecom Conference, Defendants claimed that "*our branded checkout is healthy, it's growing*."

*26.*     On March 13, 2024, during the Wolfe Fintech Forum, Defendants claimed "*branded checkout is growing healthily,*" and "*we continue to think that branded will grow healthily*."

27.     On July 30, 2024, Defendants published PayPal's results for the second quarter of fiscal year 2024.   During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

> *We're encouraged to see not only the strength and stability in PayPal's platform, but also early contributions from some of the initiatives we have underway. Branded checkout continues to grow profitably.*
>
> . . .
>
> *Within branded checkout, we continue to see strength across large enterprise platforms, marketplaces and international growth.*

28.     On October 29, 2024, Defendants published PayPal's results for the third quarter of fiscal year 2024.   During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

> *I'm proud of our team's innovation velocity as we reestablish ourselves as the best converting branded experience for consumers and merchants.*
>
> . . .
>
> *Maybe something we haven't connected the dots on well enough is all of the innovation that we're doing with Fastlane and with PayPal Everywhere and with what I talked about in my remarks on branded checkout, it all comes back to that*

---

[1] Emphasis added throughout unless otherwise noted.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*durable branded checkout growth, right? PayPal Everywhere, we're starting to see real habituation of people not just getting access to the offline checkout, but also now bringing that back into online. So, all of this is driving back branded checkout growth.*

. . .

*What I'd say is branded checkout has been very consistent. We are, again, the largest, best converting and most share of branded checkout anywhere in the world, and it has been consistent.*

29.    On February 4, 2025, Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2024.  During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*I think it's really important to set our branded checkout strategy in context. First, as Jamie said, and I think we've been consistent throughout the year, we're excited about the innovations. I think we've been pretty prudent in the way that we have looked at a forward guide.*

. . .

*But if I just step back and think about the strategy, think about what we did in 2024, we really worked on innovation and what I would call just fixing the basics of branded checkout. As I described earlier, an improved product now in the hands of customers on both desktop and mobile, and we're now starting to see that scale.*

30.    On February 25, 2025, Defendants conducted their annual Analyst/Investor Day call.  During the call, Defendants made a series of claims regarding PayPal's branded checkout business and business outlook:

*Well, we've committed from a guidance to grow greater than 5% in transaction margin in 2025. As we look out into 2027, we see high-single-digit growth for transaction margin.*

. . .

*We are maniacally focused and what you will hear throughout the rest of the day is our strategic imperatives that I laid out at our last earnings call are where our teams are focused and executing, and they are all in line with the vision that I just laid out. We will win checkout.*

. . .

6

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Now what is really important is that if you look at this numbers, every start – every start that we have in this page shows that *every consumer product leads to checkout*. And that is a very important distinction for our strategy. *That's why it's both about having an amazing checkout experience, but it's also critical that we build and we nurture a consumer product ecosystem that drives engagement, that gives us more ways to monetize and that keeps reinforcing selection*.

. . .

*So, I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027.*

*We will measure success by growing our new experience share to over 80%, growing Pay Later usage by more than 20% and growing pay with Venmo by more than 40% as you heard in Diego's section.*

*So, to summarize, we have a rigorous plan to drive checkout growth. We're reigniting consumer selection. We have reimagined checkout experiences and innovated with Fastlane. And those are highly performing to exceed merchant and consumer needs. And now, we're laser focused on scaling them across our global merchant base. When we talk to merchants, they are impressed by our new experiences, which opens doors for having much more holistic conversations about how we help them driving their business.*

. . .

*Merchants typically enter to our ecosystem through branded checkout*. Then, they adopt processing and move to platform integration, which allows us then to add higher margin value-added services and new innovations. As you can see down there, we have a lot of upside.

. . .

I want to leave you with three takeaways. *We're raising the bar on branded checkout. We have an end-to-end plan to accelerate growth. Our new experiences are delightful for consumers and drive conversion and outcomes for merchants.*

. . .

Looking ahead, we have a diversified portfolio to drive growth. And what you see on this slide is a more simple and relevant TPV breakout than in the past. It's a better way of how we think about the product portfolio today, our customer needs and our use cases, and we're making progress across each of these areas. *So, the first online branded checkout includes PayPal branded checkout, eBay and Pay with Venmo, and it's about 30% of our TPV. We have a clear plan and execution milestones to accelerate and I'll talk about that more in a bit.*

. . .

7

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

I want to take a minute and walk you through some of the specific goals and ways for you to track our progress, underpinning each of the initiatives. *And starting with checkout, which is at the center of everything we do, our new products, partnerships, and campaigns are all aimed at accelerating checkout. We want to be the easiest, the fastest, the safest solution and it is essential we deliver more value to customers.*

. . .

*[W]e spend a lot of time benchmarking ourselves versus competition*. The first thing I'd say is we have to have a best-in-class experience for consumers. And that's what you saw today, which is -- and I've been very consistent. If you go back a year ago, that branded checkout experience, particularly on [mobile], as Frank walked through today was entering your e-mail, entering your password, it was very clunky. *And our ability to now leapfrog competition and ensure that we have the best-in-class consumer experience is step one.*

But *that is insufficient. I think if we are here three, four years from now talking about a frictionless checkout experience, we, as an industry, have failed*. This has to now turn into commerce experience. This has to turn into an experience, where you as a customer are getting a personalized checkout experience, just like you saw on screen today where I go into my store, I go to checkout, and I'm getting in our case, a button that is speaking to me. It knows me, it's personalized to me. It's giving me the right reward. It's understanding the loyalty that I have with this merchant.

*That, to me, is a completely different experience. And I think we are the only ones with a two-sided ecosystem with access to merchants at scale with access to 80 million-plus shopper profiles and access to hundreds of millions of consumers on an open agnostic platform to be able to deliver that next version of commerce.*

. . .

The way I think about it is, again, *if we change the game in how we engage with our merchants, branded checkout gets far more valuable for our merchants as well*. So, you're already starting to see things like habituation with Buy Now, Pay Later. Right, the increase in now bringing Buy Now Pay Later into the experience. *The uplift it gives for merchants is also economics for us as well.*

But *what we're starting to see is we're having merchant conversations, and I'm having many of these personally with CEOs of some of our largest merchants, is we are now able to bring them new customers*. And so, the people they're bringing into the conversation are their CMOs, are the people talking about customer acquisition. *And so, we're tapping into economics and the relationship that's beyond just their payments person or their checkout person.* And so, I just think, again, it's the biggest mindset shift that I asked you all at the beginning, and I will continue to ask you all to go through now, which is *the evolution of a payments company that is just focused on creating a frictionless checkout experience,*

8

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*which we are still the number one player in into a commerce company, and I think it just taps us into much broader addressable markets*.

. . .

[A] lot of what we're doing around branded checkout, driving debit, driving Buy Now, Pay later, driving Pay with Venmo, *these are all high-margin products in addition to the habituation and other halo effect they bring to branded. And we see that halo effect in the cohorts and in the numbers. And so, when you look at take rates, some of those do carry lower take rates, but they're margin accretive. And so, margin will be accelerating over the time as we do this, but at the same time, take rate may shift based on product mix and things like that.*

. . .

*Let me go back to the point about the shift on the mindset because we are moving from a value proposition that was only about checkout*, meaning a button, to a value proposition about PayPal, which means we want people to stay. We want consumers to stay in our ecosystem because there is a much larger equation of value from them when they do more with PayPal. So, *it starts with checkout. As we were saying before, now we are connecting the rest of the products from the ecosystem to check out like never before, from debit to pay later, to Pay with Venmo, even crypto now*.

. . .

*So, when you put all of this together, you're going to get so much value as a consumer that is going to be really compelling for you to stay with us.* On top of that, and you saw to the - what we did last September, our marketing is also changing to, number one, help you think differently about PayPal. It's not just for some purchases or just for online purchases, it's for all purchases. And that is a massive change for the way the consumer thinks about PayPal, which in combination with the other things, is going to allow us to keep you super engage[d] with our brand.

. . .

*I think the fact that we have both sides of the ecosystem gives us an opportunity to create completely differentiated experiences*.

. . .

And so, when you think about a loyalty experience, I mean, everyone think back to the '90s when you had a thick wallet with a whole bunch of loyalty cards sitting in there. Those have gone away as you've now moved to a phone. But that also means that your relationship with your local merchant, your relationship with that loyalty platform has gone away as well. *I think we have an opportunity to bring that back. So that that consumer understands that, hey, this is where I make my purchases all the time. And this is where I want my rewards and my loyalty to be, and the*

9

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*merchant gets to have a deeper relationship with those consumers. And I think we have a very, very unique opportunity to create that flywheel.*

. . .

From a margin dollars perspective, *our guidance this year assumes 100 basis points of shift in margin*. And certainly, all the things I talked about are a part of that and a significant part of that. *Branded checkout, we're already at 30% penetration in the U.S. on the merchant experiences.* All the work Diego has done around offline, debit, marketing, that stuff you're going to see us continue and be very focused on as we move through 2025.

So what I'd say to that is it will be a gradation over the period of time is how to think about transaction margin. *When we come over to branded checkout, the U.S. side of it, we are very, very focused on U.S. growth with branded checkout. It is something that has the full weight of the organization behind it.*

31.    On April 29, 2025, Defendants published PayPal's results for the first quarter of fiscal 2025 year.   During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

In Q1, we delivered our fifth consecutive quarter of profitable growth, with transaction margin dollars growing by 8%, excluding the impact from last year's leap day. *That growth was driven by multiple sources across our strategic initiatives, including omnichannel commerce, both online, branded checkout and off-line branded payment methods, Venmo and PSP.* As a result of this focus on profitability, non-GAAP earnings per share increased 23% year over year.

Additionally, PayPal and Venmo are being used by more people more often. Both total active accounts and monthly active accounts grew a healthy 2% in the quarter. Transactions per active account ex-PSP grew 4%, reflecting improved engagement and transaction growth in online branded checkout and Venmo.

As we expand our offerings from online to everywhere, *the best way to see the traction we're gaining is through branded experiences, TPV. Branded experiences comprises volume from PayPal and Venmo online checkout as well as branded in-store payment methods like debit and tap to pay*.

*In Q1, branded experiences TPV grew 8%, excluding last year's leap day. That's a full 2 points higher than branded experiences' growth for the full year of 2024, highlighting the growing contribution of our omnichannel initiatives. It's still early days, but we are very proud of this progress.*

Within branded experiences, we're continuing to accelerate the rollout of our upgraded online branded checkout flows. This includes our simplified and modernized paysheet design, with streamlined log-in and reduced latency. *Since the beginning of the year, we've driven a 25-point jump to more than 45% of U.S.*

10

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*checkout traffic. This shows we can execute, and we anticipate an even faster rollout for Europe starting in the second quarter.*

And finally, Venmo had another standout quarter. We hit an important inflection point for Venmo monetization, with 20% revenue growth, driven by our push to make Venmo one of the best ways to pay online and in-store.

*These are only a few examples of the strength we're seeing in the execution of our strategy. We're feeling the excitement of our innovations in the market and the engagement from our consumers and merchant partners, and we're just getting started.*

. . .

*Starting with win checkout. Online branded checkout TPV, including PayPal and Pay with Venmo, grew nearly 6% this quarter, accounting for last year's leap day. We're proud of this growth and expect it to increase over time as more traffic flows through our upgraded experience.*

. . .

Today, our PayPal and Venmo debit cards are enabling our customers to use their balance to shop anywhere cards are accepted. Adoption is strong and growing, with approximately 2 million first-time PayPal and Venmo debit card users in the quarter, an increase of nearly 90% from last year. Debit card TPV grew approximately 64% in the first quarter. Venmo debit card monthly active accounts grew nearly 40%, and penetration has reached to 6% of Venmo MAAs.

We are focused on getting these products into the hands of even more of our customers because they allow them to choose PayPal and Venmo as their way to pay more often. In the first quarter, users who adopted the PayPal debit card transacted nearly six times more and generated more than two times the average revenue per account, compared to those who used online branded checkout only. *There is also a halo effect where debit card users choose PayPal more often in online branded checkout.*

. . .

*In the first quarter, online branded checkout volumes grew more than 4% on a currency-neutral basis. And excluding last year's leap day, which contributed over 1 point to growth, online branded checkout volumes increased nearly 6%. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap to pay, grew 8% ex leap day*, accelerating from the prior year.

. . .

*Transaction revenue was flat on a spot basis or up 1% on a currency-neutral basis to $7 billion, driven primarily by branded checkout, Venmo and SMB processing.*

11

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

We've got -- this is the strategy that we've laid out really coming to light. So first, *we have a branded checkout strategy that is really about driving habituation everywhere that the customer wants to pay*. We have such strong brands in both PayPal and Venmo. And our customers are asking to be able to leverage that trust, the safety, the brand, the rewards in every purchase that they make.

*And so, we've been focused on not only improving that online experience that we've talked about, and I'm sure we'll talk about more, making it available for them exactly how they want to pay, whether that's immediately or with pay later scenario, with buy now, pay later, but then also offline.*

And you mentioned branded experiences. This really is enabling our PayPal debit card or our Venmo debit card to be accessible to our consumers. *We saw PayPal debit card TPV growth over 100% in Q1. And that really is driving habituation. This is driving our consumers to actually start to come back, move online and start to pay with PayPal wherever they see it.*

*So, the strategy is working. TPV, up 8% overall in branded experiences. And this really is the metric that we are focused on and we hope you're focused on as well because, again, it is really all about the strategy that we've laid out.*

. . .

*[J]ust to unpack our branded strategy, I'd really think about it as 3 parts. One is the improved branded checkout experience. And as you mentioned, we've moved very quickly up now over 45% in the U.S.* Again, that still is -- think of that as sort of double digits of our global transactions. And so *we're really excited. We think we've got a really strong playbook now. And we think, as we start to roll this out into Europe, we'll actually accelerate even faster*. But our paysheet redesign is holding, the improvement is holding, and now this is just about scaling.

*Second lever is really accelerating Pay with Venmo*, and you've seen the results there. So very, very fast flywheel starting to happen from a Pay with Venmo perspective. TPV up over 50%, and MAAs up over 30%.

*And then the third lever is buy now, pay later and our pay later products.* And again, TPV up over 20%.

*So you add all three of those together, and as we continue to see us leaning into those three levers, I don't know the exact timing of when we'll start to see branded checkout, but we put pretty strong growth numbers of 8% to 10% by 2027.* And I think those 3 levers continue to give us confidence that we're executing well and heading in that direction.

. . .

12

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*It is early, but we talked in the fourth quarter about seeing some shifting in our U.S. branded checkout levels. We saw that hold again this quarter, watching it very closely but cautiously optimistic about that.*

. . .

And I think what we're really excited about is that we're bringing our new product innovation to the market in Europe starting this quarter. *So we'll start with Germany and the U.K. And this is the checkout redesign.* It is buy now, pay later. It is omni and NFC launches. And brand marketing to accompany all of that, with a fast follow to other countries after that.

*So I think the overall look right now, we feel pretty good about branded checkout and just laser-focused on our execution.*

. . .

*Germany, we are really the market leader there. I think we're the number one brand in Germany for the last 3 years. So very, very strong consumer presence, very strong merchant presence.*

*It's also a different type of market. As I just mentioned, it was not a -- it's not a credit-heavy market. So the way PayPal is used is we're connected to bank, and then PayPal is used as really the way to make an online purchase. And so our transactions in e-commerce in Germany are extremely high. That's what gives us a lot of confidence as we now move into off-line, is we're really going to be really one of the first at-scale, bank-connected, off-line wallets that we think will be able to drive significant penetration into the market.*

So we're really excited about that as well as bringing some new innovations to market with not only our rewards program, but also the buy now, pay later connected element as well. *So with the brand presence we've got in Germany, with the banks already connected and the onboarding experience, that's just really delightful. I mean it's literally one click from your bank to be able to set up your off-line wallet. And with the innovation of rewards and buy now, pay later, we're really excited to get into the market there.*

*U.K., much more competitive dynamic there. We've really suffered in the last few years with what I would consider to be one of our poorest app experiences for consumers.* We're rolling out a new app experience in the U.K. shortly. But we've already started with, as you mentioned, the biometrics. So we actually got a favorable connection with the regulator there to enable us to enable our biometrics to be considered 2-factor authentication. That's rolling out quickly and enabling a much better experience, whereas before, it really was choppy and created a lot of friction and a lot of latency in the experience.

*Biometrics is now really creating a seamless experience. You add on top of that the new app that's going to be rolling out and then our rewards program and all the other innovation that we brought to bear. And we think we're going to be*

13

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*competing quite well in the U.K. And you'll see us leaning in from a go-to-market perspective as well to really remind consumers that we now have the best product in the market.*

32.    On July 29, 2025, Defendants published PayPal's results for the second quarter of fiscal year 2025.   During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*We delivered our sixth consecutive quarter of profitable growth despite the macro uncertainty.* Transaction margin dollars grew 8%, excluding interest on customer balances. *Success across many of our strategic initiatives contributed to that growth, including online and off-line branded experiences, payment services and Venmo.* This highlights a healthy business with multiple avenues to sustain and accelerate growth, and non-GAAP earnings per share increased 18% year-over-year. We continue to build upon our broad reach and strong engagement. Both total active accounts and monthly active accounts grew 2% in the quarter. Transactions per active account ex-PSP grew 4% as more people use PayPal and Venmo more often.

*If we look at our four strategic growth drivers: winning checkout, scaling omni and growing Venmo, driving PSP profitability, and scaling our next-gen growth vectors, we are making meaningful and tangible progress on all four.* I'd like to walk through each one, highlighting examples of our progress. *The first two growth drivers are entirely focused on improving and growing our branded experiences. I'm proud that we drove 8% currency-neutral growth in branded experiences TPV this quarter. This positive result reflects the benefit of meeting our customers wherever they choose to shop with PayPal and Venmo, online and offline.* As a reminder, branded experiences includes winning checkout, expanding buy now, pay later, winning with Venmo and scaling omnichannel capabilities.

Starting with online branded checkout. TPV, including PayPal, BNPL and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year. *Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs.*

Our focus is on the things that are within our control and that we know will have a positive impact on our overall growth trajectory over time. That starts with driving more traffic through our upgraded checkout experiences, both in the U.S. and internationally. *These upgrades offer a much better consumer experience, improved presentment of BNPL and drive meaningful conversion rate improvements. This is currently rolling out in the U.S., Germany and the U.K., and we have a comprehensive playbook that we will apply to other countries.*

. . .

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Finally, I'd like to explain how last week's announcement of *PayPal World will be a game changer for our branded experiences*.

. . .

For businesses, it means building the technology to accept dozens of wallets, which adds unnecessary costs and creates a fractured experience full of friction for customers, ultimately limiting reach and, of course, sales. When you want to sell to the world, how do you choose which wallets to accept and which customers to turn away? You shouldn't have to make that choice. *This is where PayPal World comes in to make it simple and easy to connect any consumer with any merchant.* Five of the largest digital wallets in the world, PayPal, Venmo, Mercado Pago, Tenpay Global and UPI are coming together on a seamless global platform. So you can now use your preferred wallet anywhere in the world.

*For our PayPal merchants, PayPal World will mean access to billions of new customers through their existing branded checkout integration.* Now a UPI user in India who wants to buy a pair of sneakers from an online store in Germany that accepts PayPal can simply click the PayPal button at checkout and their familiar UPI button will be presented for them to complete the transaction. It's that simple. *This means our connections for branded checkout will extend beyond our 400 million customers to more than 2 billion consumers worldwide, and that will continue to grow.*

. . .

*Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay posted another quarter of 8% growth.*

While debit and tap-to-pay spend represent a smaller amount of volume in branded experiences today, they are growing rapidly and are up more than 60% year-over-year. *Winning checkout remains our most critical priority. Our teams are laser-focused on advancing the many initiatives that reinforce our checkout business. In the second quarter, online branded checkout volumes grew 5% on a currency-neutral basis.*

. . .

[T]hank you for the question, and I appreciate the comments on branded checkout. *Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for.* And really, the cohorts that we now have live in market are delivering exactly the way we expected. *To the comment on these platforms from Asia, the way we think about it is, without that pressure, our branded checkout really would have been at 6%. And so, it's a small amount, but we've started to see it stabilize a little bit as we get into this month.*

. . .

15

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

I would just say that *our trends underlying all this really have been broadly consistent. There's puts and takes in any given quarter. And like Alex said, we did see a slight deceleration really in those Chinese to U.S. corridors*. In July, I would say it's still early, but seeing a bit less pressure in that space. *We plan the full year with branded checkout at mid-single digits. We are on track for that.* And the watch-out that I really – I am looking at is, we still have a fair amount of policy and macro uncertainty. So we're obviously monitoring that. *But we're very focused on our execution around our strategic initiatives.* And bending the curve takes time, and we expect to accelerate as we move through the next couple of quarters and the next couple of years.

. . .

*[W]e're very excited, and you can hopefully, you're seeing the pace of our innovation just continue to accelerate and sort of you're starting to see our whole strategy and the system that we're building together really play out*. Let me take each of those. So PayPal World - I think the easiest way to think about it in the short term is, a, what I'm really excited about is the interoperability between PayPal and Venmo. So now you've got a huge amount of Venmo customers that can click on the PayPal branded checkout and make their purchase online.

*Then we've opened it up to almost 2 billion additional users, and that will just continue to grow. And the best way to think about it is that's branded checkout.*

. . .

On *Pay with Crypto, we really do see this as, again, expansion of TAM at pretty attractive economics*.

. . .

So again, just to highlight, *we were very deliberate in our strategy to start our rollout of our new branded experiences in the U.S. We're up over 60% now in the U.S. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected*, that we talked about in the past.

*We've now started to roll that out in the U.K. and Germany.* As I mentioned previously, those integrations typically are on newer integrations throughout Europe. And so I actually think *we're going to continue to accelerate our adoption over the coming quarters across Europe. So very, very excited there*. We're mid-teens overall on global TPV, and we want to see that continue to increase over the next few quarters.

. . .

*If you look at outside the U.S., again, we're really seeing largely consistent trends here. We continue to take share in Europe, including Germany. And as Alex mentioned, our broad push around our latest innovation, it's not just the latest*

16

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*experience, but it is buy now, pay later. It is the new app and app upgrades and the experience around that.* It's in its NFC, which we had a really successful rollout in the second quarter in Germany around that. *So it's all around branded checkout, really driving the habituation and the resulting halo that comes with that. And the teams are really focused on scaling that and pushing that as they go through.*

*With respect to accelerated rate, what I would tell you is that we are laser-focused on branded checkout. And I think as we talk about all of this, that focus on execution, the focus on the strategic initiatives, we fully expect to see an accelerated rate of growth over the next few quarters and the next few years.*

. . .

*[F]rom the cohorts that we've rolled this out to, and remember, this is 15% of global TPV, we're continuing to see the uplift* that we've talked about, call it, one point of uplift. *So that is going to continue. We just need to roll this out to more.* And so our expectation is if you look at branded checkout overall, it's this new branded experiences, it's the momentum that we've got in buy now, pay later, which we're seeing over 20% year-over-year growth. It's the improvement in Pay with Venmo, which we're seeing 45% year-over-year growth. All of those coming together, we continue to see momentum on.

*And so as we exit this year, I expect that we're going to start to see real improvement in branded checkout overall and then as we move into 2026. So - this is a big shift. It takes time to move. I'm excited about the momentum we have across all three of those elements, the new experiences, buy now, pay later and Pay with Venmo. And I think we're going to start to see this thing turn as we get through the next few quarters and into 2026.*

33.     On October 28, 2025, Defendants published PayPal's third quarter 2025 results. During the corresponding earnings call, Defendants made the following statements regarding branded checkout and the Company's business outlook:

*Thanks to our omnichannel initiatives, we've accelerated branded experiences TPV growth to be between 7% and 8% on a currency-neutral basis over the past four quarters.*

. . .

Put simply, this is the new PayPal, built for faster, more profitable growth. *Our strong foundation, differentiated competitive advantages and clear strategic direction position us to capture a massive and growing addressable market. With building execution momentum, we are driving innovation at a remarkable pace and scale. This makes us exceptionally well placed to win into the future.*

. . .

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.*

Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency-neutral basis. *That solid growth, especially with the choppy global macro trends we continue to see this quarter. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth.*

. . .

*I'm proud of the progress that we've made this quarter from partnerships to new product innovations, to continuing to strengthen our profitability.*

. . .

*The diversification and quality of this growth is a meaningful improvement from where we were at the start of the company's transformation. We have clear opportunities to build on this progress with investments that strengthen our competitive position and drive durable profitable growth.*

. . .

*We've moved branded experiences to the top of this slide to reflect the importance of this metric to our more expansive strategy and value creation.* Looking across the product portfolio, *we see encouraging signs that our initiatives are gaining traction and making an impact. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap-to-pay posted another quarter of 8% growth.*

. . .

*We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the road map that our teams are advancing. The early results in the U.S. demonstrate that we're on the right path with our initiatives*, including our redesigned experiences; buy now, pay later; and Pay with Venmo. *We're laser-focused on execution across the three key areas Alex discussed: scaling our redesigned experiences, improving prioritization and driving biometric adoption.* All of this is increasingly complemented by a compelling consumer value prop that differentiates PayPal and Venmo as one of the best, most rewarding ways to pay.

While this work is complex and takes time, *we fully expect to see our efforts build as we move through the next year and scale these initiatives*. Pay with Venmo and buy now, pay later continue to outpace the market, taking share from other payment methods, growing 40% and 20%, respectively. *These results give us the confidence to begin making targeted investments in the fourth quarter that amplify the impact of these and other initiatives throughout the portfolio.*

18

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

. . .

Following another quarter of strong financial performance, *we are raising our full year guidance for TM dollars and non-GAAP EPS*. For the fourth quarter, we expect currency-neutral revenue growth in the mid-single digits. *We expect fourth quarter TM to be between $4.02 billion and $4.12 billion, which represents about 3.5% growth at the midpoint. Excluding interest on customer balances, we expect TM dollars to grow by about 5% at the midpoint compared to 7% year-to-date.*

Setting interest rates aside, there are a few factors to highlight that impact our fourth quarter outlook. First, we have seen strong credit outperformance over the past year, driven by good execution from the team as well as a more benign loss environment. We expect to see year-over-year comparisons start to normalize more in the fourth quarter.

*Second, given the performance of some of our key initiatives, we see an opportunity to lean into our competitive differentiation with additional investment to drive faster growth over time.* In the fourth quarter, we will begin increasing investments designed to drive product attachment and habituation. Some of these investments are linked to volumes and, therefore, recorded as contra revenue impacting TM dollars and designed to drive additional growth over time.

Other growth investments such as global brand awareness campaigns, typically sit within marketing and non-transaction OpEx. Lastly, on TM, *our fourth quarter guide assumes some deceleration in branded checkout growth relative to our third quarter average. From a volume perspective, the most important weeks and months of the quarter still lay ahead*. That said, *we are planning prudently given recent spending trends and the uncertain macro backdrop. We are also cognizant of lapping strong consumer spending in the fourth quarter of last year*.

. . .

*We are operating from a position of strength. The results you're seeing are proof that our strategy is working.* We built a more balanced, profitable growth engine across branded experiences, PSP and Venmo, and that's exactly what we set out to do. We're investing in high-impact growth initiatives that will move the needle and future-proofing the business with critical partnership, while simultaneously returning value to shareholders through our buyback program and our newly launched dividend. *We have moved this business from defense to offense, from stabilization to acceleration. We know exactly where the opportunities are, and we are laser-focused on executing our strategy.*

. . .

*We've had consistent mid-single-digit growth in branded checkout for multiple quarters now. And for the quarter, we've seen really good momentum across our growth initiatives with buy now, pay later, with Pay with Venmo. And we've seen continued U.S. growth at higher rates as well this quarter.*

19

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*When we got into September, we began to see macro-related deceleration. And that is both in the U.S. and in Europe. And I talked about it in my prepared remarks, but really a relatively consistent number of transactions, but we're seeing basket sizes just trade down.* Average order value being down, particularly in retail where consumers are just being more selective. *And that behavior has continued into October. So obviously, it's really early in the fourth quarter. The holiday season is very back-end loaded. So it's something we're watching.* But we did call out, and you're right, *our guidance assumes a rate of growth lower than third quarter.*

*And so when you look at that macro and I pivot now to talking about the broader framework, we've seen very good progress. And I think what I'm most excited about is we know what's working, and we're really doubling down against that.* And Alex has talked a lot about buy now, pay later. We've talked a lot about Pay with Venmo. *And importantly, year-to-date in the U.S., our growth rates are higher than what we saw year-to-date last year in the U.S. So we're really seeing nice progress. But that macro piece of it, whether it's tariffs or some of this deceleration is offsetting our progress. And we set those 2027 targets, assuming a strong -- or assuming a consistent consumer macro environment. And ultimately, that's how we'll measure progress against that.*

*What I am excited about is we have scaled our initiatives in the U.S. first. And so where we see progress, we've got real confidence as we scale outside of the U.S. and internationally.*

. . .

*And look, I'm as impatient as anyone, I want to see this move as fast as we can. But we're talking about bending the curve on over $0.5 trillion of spend, and it's just taking time to get there. So we have confidence, as Jamie mentioned earlier, U.S. branded checkout is growing faster year-to-date than it did in 2024. So we know the experiences are working. We're now rolling it out in Europe. We expect that to continue through 2026.  And in the meantime, we're leaning into BNPL growing north of 20%, Pay with Venmo growing north of 40%. And so we know that overall, in branded checkout, we're on the right path, it's just taking time.*

34.    The above statements in Paragraphs 24 to 33 were materially false and misleading because Defendants failed to disclose that operational and execution issues were harming PayPal's branded checkout business.

**The Truth Begins to Emerge**

35.    On February 3, 2026, investors began to learn the truth when Defendants published PayPal's results for the full year and fourth quarter of fiscal year 2025.  As part of these results, PayPal disclosed weak branded checkout growth of 1% compared to 5% in the prior quarter.

20

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants admitted that much of this slowdown was attributable to "operational and deployment issues." Along with these poor results, PayPal withdrew its financial outlook and announced the sudden departure of its CEO Defendant Chriss.

36. On this news, the price of PayPal stock declined from $52.33 per share on February 2, 2026, to $41.70 per share on February 3, 2026, a decline of over 20 percent.

## CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired PayPal common stock between February 8, 2024, through February 2, 2026, inclusive (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of PayPal, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

38. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, PayPal's common stock was actively traded on the NASDAQ, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PayPal or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

39. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the price of PayPal stock was artificially inflated; and

(f) The extent of damage sustained by members of the Class and the appropriate measure of damages.

40.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

41.    Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation.  Plaintiff has no interests which conflict with those of the Class.

42.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

43.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiff and other members of the Class purchased PayPal stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

22

44.     At all relevant times, the market for PayPal stock was efficient for the following reasons, among others:

      (a) as a regulated issuer, PayPal filed periodic public reports with the SEC;

      (b) PayPal regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

      (c) PayPal was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

      (d) PayPal securities were actively traded in an efficient market, including its common stock that was traded on the NASDAQ under the ticker symbol "PYPL."

45.     As a result of the foregoing, the market for PayPal stock promptly digested current information regarding PayPal from all publicly available sources and reflected such information in the price of PayPal stock.

## NO SAFE HARBOR

46.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

23

because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PayPal who knew that the statement was false when made.

## ADDITIONAL SCIENTER ALLEGATIONS

47.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

48.     The Individual Defendants permitted PayPal to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

49.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PayPal, their control over, receipt, or modification of PayPal's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning PayPal, participated in the fraudulent scheme alleged herein.

50.     In addition, branded checkout is PayPal's most important business line, with Defendants describing it as "the heart of PayPal" and the Company's "most important initiative" that "has the full weight of the organization behind it."  Accordingly, branded checkout was crucial to PayPal's business, as the Defendants spoke about it on every conference call with investors during the Class Period, and repeatedly emphasized its importance.

51.     Further, Defendant Chriss, who spearheaded PayPal's strategic initiatives, was abruptly removed from his position as CEO after just 16 months. There were no signs that Chriss'

departure was planned or that he was slowly stepping away from the business to make room for a successor.

52. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PayPal common stock by disseminating materially false and misleading statements or concealing material adverse facts. The scheme deceived the investing public regarding PayPal's business, operations, and management and the intrinsic value of PayPal stock and caused Plaintiff and members of the Class to purchase PayPal stock at artificially inflated prices.

## LOSS CAUSATION

53. During the Class Period, as detailed herein, PayPal and the Individual Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of PayPal stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of PayPal stock fell significantly. As a result of their purchases of PayPal stock during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

*For Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

*Promulgated Thereunder Against All Defendants*

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

58.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

59.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PayPal personnel to members of the investing public, including Plaintiff and the Class.

60.     As a result of the foregoing, the market price of PayPal stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

market price of PayPal stock during the Class Period in purchasing PayPal stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

61. Had Plaintiff and the other members of the Class been aware that the market price of PayPal stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

62. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

63. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PayPal stock during the Class Period.

## COUNT II

### *Violations of Section 20(a) of The Exchange Act*

### *Against the Individual Defendants*

64. Plaintiff repeats and realleges the allegations contained in the ¶¶ 1-53 as if fully set forth herein.

65. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

66. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

67. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

68. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

1. Declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

2. Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

3. Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 2, 2026                     Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**

FRANCIS P. MCCONVILLE (*pro hac vice* forthcoming)
(fmcconville@labaton.com)
CONNOR C. BOEHME (*pro hac vice* forthcoming)
(cboehme@labaton.com)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiff*

29

## CERTIFICATION

I, Kathleen Kiely-Becchetti, as Executive Director of Norfolk County Retirement System ("Norfolk County"), hereby certify as follows:

1.      I have reviewed a complaint prepared against PayPal Holdings, Inc. ("PayPal") alleging violations of the federal securities laws, generally adopt the allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint, and authorize the filing of this pleading;

2.      Norfolk County did not purchase common stock of PayPal at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Norfolk County is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Norfolk County fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Norfolk County's transactions in PayPal common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Norfolk County sought to serve as a lead plaintiff and representative party in the following class actions under the federal securities laws filed during the last three years:

*Plumbers, Pipefitters and Apprentices Local No. 112 Pension Fund v. Vestis Corporation,*
No. 1:24-cv-2175 (N.D. Ga.)
*Norfolk County Retirement System v. Super Micro Computer, Inc.,* No. 4:24-cv-6980 (N.D. Cal.)

6.      Beyond its pro rata share of any recovery, Norfolk County will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 31st day of March, 2026.

Kathleen Kiely-Becchetti
Executive Director
Norfolk County Retirement System

2

## EXHIBIT A

### TRANSACTIONS IN PAYPAL HOLDINGS, INC. COMMON STOCK

| Security | Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|---|
| Common Stock | Purchases | 09/19/2024 | 578 | $77.7350 | ($44,930.83) |
| Common Stock | Purchases | 09/19/2024 | 19,071 | $77.5493 | ($1,478,942.70) |
| Common Stock | Purchases | 09/27/2024 | 1,717 | $78.8470 | ($135,380.30) |
| Common Stock | Purchases | 11/08/2024 | 5,128 | $82.6780 | ($423,972.78) |
| Common Stock | Purchases | 04/03/2025 | 4,417 | $62.5179 | ($276,141.56) |
| Common Stock | Purchases | 12/17/2025 | 7,267 | $61.5371 | ($447,190.11) |